**PHILLIPS & PAOLICELLI, LLP**
Quakerbridge Executive Center
101 Grovers Mill Road
Lawrenceville, NJ 08648
Phone: (609) 789-5600
747 Third Avenue, 6th Floor
New York, NY 10017
Tel.: (212) 388-5100
*Attorneys for Plaintiffs By*:
Steven J. Phillips, Esq.
Daniel J. Woodard, Esq.
Victoria E. Phillips, Esq.
Russell J. Curley, Esq.
Marc C. Gorrie, Esq.

**WATERS KRAUS PAUL & SIEGEL LLC**
3141 Hood Street, Suite 200
Dallas, TX 75219
Tel: 214-357-6244
Attorneys for Plaintiffs By:
Peter A. Kraus, Esq.
Caitlyn Silhan, Esq.
Chase Johnson, Esq.
(*pro hac vice to be submitted*)

**COONEY & CONWAY LLP**
191 N. Wacker Drive, Suite 1500
Chicago, IL 60606
Tel: (312) 236-6166
*Attorneys for Plaintiffs By*:
Kevin Conway, Esq.
(*pro hac vice to be submitted*)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GINA STROHM, SUSAN HINKSON, ALBERT HINKSON, JOHN D. HUTCHINSON SR., individually and as Executor of the ESTATE OF THERESA HUTCHINSON,, ROZALIA DIMARCO, KATHLEEN TALOTTA, ROBERT TALOTTA, DARLENE TORREY, ANTHONY TORREY, ANTOINETTE CANZANESE, Individually and as Executor of the ESTATE OF TERRY DONAHUE, LAURA RUMBOL, GEORGE RUMBOL, PETER CAPPOLA, NATALIE CAPPOLA, JOHN DAGNEY, RICHARD ST. PETERY, LAURA SKONETSKI, NICHOLAS BAUD, JAMI CUBBLER, NICOLE FUNK, JOSEPH FUNK, DAWN HARREL, BARBARA MAZZATENTA, DANIEL MAZZATENTA, SHARON MCCOOL, JOSEPH LUCCA, MARY LUCCA, ROBERT WHITE, LAVINA WHITE, GREGOREY WENNING, BARBARA WENNING, STACEY GRUNDLOCK, SCOTT TURGEON, ARTUR KOFMAN, KARINA KOFMAN, DIANA KOFMAN,  DANIEL TARPLEY,  GERALDINE  DOYLE, WILLIAM DOYLE, PAULA TRAPUZZANO, RICKY TOCH, TRACY REBEL, CELINA MORTON BURK, EVERETTE BURK, ELWOOD P. MARTZ, III, LUCY MARTZ, MARQUIS MOORE, SHAWNA MORRIS, KELLYANN BLYMER individually and in her capacity as Administrator Ad Prosequendum of THE ESTATE OF OLIVIA BLYMER, | DOCKET NO. 1:26-cv-6595<br><br>**COMPLAINT AND JURY DEMAND** |

1

decedent, JAMES BLYMER, RILEY BLYMER, and ANTHONY CASAZZA,

Plaintiffs,

v.

THE 3M COMPANY, INC.

Defendant.

Now comes Plaintiffs GINA STROHM, SUSAN HINKSON, ALBERT HINKSON, JOHN D. HUTCHINSON, SR., Individually and as Executor of the ESTATE OF THERESA HUTCHINSON, ROZALIA DIMARCO, KATHLEEN TALOTTA, ROBERT TALOTTA, DARLENE TORREY, ANTHONY TORREY, LAURA SKOTENSKI, ANTOINETTE CANZANESE, Individually and as Executor of the ESTATE OF TERRY DONAHUE, LAURA RUMBOL, GEORGE RUMBOL, PETER CAPPOLA, NATALIE CAPPOLA, JOHN DAGNEY, RICHARD ST. PETERY, NICHOLAS BAUD, JAMI CUBBLER, NICOLE FUNK, JOSEPH FUNK, DAWN HARREL, BARBARA MAZZATENTA, DANIEL MAZZATENTA, SHARON MCCOOL, JOSEPH LUCCA, MARY LUCCA, ROBERT WHITE, LAVINA WHITE, GREGOREY WENNING, BARBARA WENNING, STACEY GRUNDLOCK, SCOTT TURGEON, ARTUR KOFMAN, KARINA KOFMAN, DIANA KOFMAN,  DANIEL TARPLEY,  GERALDINE  DOYLE, WILLIAM DOYLE, PAULA TRAPUZZANO, RICKY TOCH, TRACY REBEL, CELINA MORTON BURK, EVERETTE BURK, ELWOOD P. MARTZ, III. LUCY MARTZ, MARQUIS MOORE SHAWNA MORRIS, the Estate of OLIVIA BLYMER, KELLYANN BLYMER individually and in her capacity as Administrator Ad Prosequendum of THE ESTATE OF OLIVIA BLYMER, JAMES BLYMER, RILEY BLYMER, and ANTHONY CASAZZA by way of Complaint against Defendant THE 3M COMPANY, INC., allege as follows:

2

## I. NATURE OF ACTION

1.      This is a civil action brought by GINA STROHM, SUSAN HINKSON, ALBERT HINKSON, JOHN D. HUTCHINSON, SR., Individually and as Executor of the ESTATE OF THERESA HUTCHINSON, ROZALIA DIMARCO, KATHLEEN TALOTTA, ROBERT TALOTTA, DARLENE TORREY, ANTHONY TORREY, ANTOINETTE CANZANESE, Individually and as Executor of the ESTATE OF TERRY DONAHUE, LAURA RUMBOL, GEORGE RUMBOL, PETER CAPPOLA, NATALIE CAPPOLA, JOHN DAGNEY, RICHARD ST. PETERY, LAURA SKONETSKI, NICHOLAS BAUD, JAMI CUBBLER, NICOLE FUNK, JOSEPH FUNK, DAWN HARREL, BARBARA MAZZATENTA, DANIEL MAZZATENTA, SHARON MCCOOL, JOSEPH LUCCA, MARY LUCCA, ROBERT WHITE, LAVINA WHITE, GREGOREY WENNING, BARBARA WENNING, STACEY GRUNDLOCK, SCOTT TURGEON, ARTUR KOFMAN, KARINA KOFMAN, DIANA KOFMAN,  DANIEL TARPLEY,  GERALDINE  DOYLE, WILLIAM DOYLE, PAULA TRAPUZZANO, RICKY TOCH, TRACY REBEL, CELINA MORTON BURK, EVERETTE BURK, ELWOOD P. MARTZ, III. LUCY MARTZ, MARQUIS MOORE SHAWNA MORRIS, KELLYANN BLYMER individually and in her capacity as Administrator Ad Prosequendum of the Estate of OLIVIA BLYMER, JAMES BLYMER, RILEY BLYMER, and ANTHONY CASAZZA ("Plaintiffs")[1].

2.      It seeks to recover damages for personal injuries sustained and that will be sustained by GINA STROHM, SUSAN HINKSON, JOHN D. HUTCHINSON SR. Individually and as Executor of the ESTATE OF THERESA HUTCHINSON, ROZALIA DIMARCO, KATHLEEN

---

[1] Theresa Hutchinson, Terry Donahue, and Olivia Blymer are also referred to in this Complaint as "Decedent" or collectively as "Decedents."

TALOTTA, , DARLENE TORREY, ANTOINETTE CANZANESE, Individually and as Executor of the ESTATE OF TERRY DONAHUE, LAURA RUMBOL, PETER CAPPOLA, JOHN DAGNEY, RICHARD ST. PETERY, LAURA SKONETSKI, NICHOLAS BAUD, JAMI CUBBLER, NICOLE FUNK, DAWN HARREL, BARBARA MAZZATENTA, SHARON MCCOOL, JOSEPH LUCCA, MARY LUCCA, ROBERT WHITE, LAVINA WHITE, GREGOREY WENNING, STACEY GRUNDLOCK, ARTUR KOFMAN, KARINA KOFMAN, DIANA KOFMAN, DANIEL TARPLEY, GERALDINE DOYLE, WILLIAM DOYLE, PAULA TRAPUZZANO, RICKY TOCH, TRACY REBEL, CELINA MORTON BURK, ELWOOD P. MARTZ, III, MARQUIS MOORE SHAWNA MORRIS, KELLYANN BLYMER individually and in her capacity as Administrator Ad Prosequendum of the Estate of THE ESATE OF OLIVIA BLYMER, RILEY BLYMER, and ANTHONY CASAZZA because of wrongful exposure to certain toxic substances proximately caused by the conduct of Defendants.  DANIEL MAZZATENTA, BARABARA WENNING, ALBERT HINKSON, JOHN D. HUTCHINSON, SR., ROBERT TALOTTA, ANTHONY TORREY, GEORGE RUMBOL, NATALIE CAPPOLA, JOSEPH FUNK, LUCY MARTZ, EVERETTE BURK, SCOTT TURGEON, KELLYANN BLYMER and JAMES BLYMER also seek derivative damages for the injuries suffered by their family members.

## II. PLAINTIFFS' INJURIES

1.    Plaintiff Gina Strohm has suffered from and continues to suffer from personal injuries including the following as well these complications and sequalae of the (se) condition (s), and attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

     a.   Ovarian cancer; and

4

      b.  Was otherwise injured.

2.      Plaintiff Susan Hinkson suffers from personal injuries including but not limited to the following as well these complications and sequalae of the (se) condition (s), and attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

      a.  Colon cancer;

      b.  Sarcoidosis;

      c.  High cholesterol; and

      d.  Was otherwise injured.

3.      Plaintiff the Estate of Theresa Hutchinson is the Estate of Decedent Theresa Hutchinson, who suffered from and ultimately died as a result of personal injuries including the following as well these complications and sequalae of the (se) condition (s), and attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

      a.  Pancreatic cancer;

      b.  Endometriosis;

      c.  High cholesterol;

      d.  Impaired vision; and

      e.  Was otherwise injured.

4.      Plaintiff Rozalia DiMarco has suffered from and continues to suffer from personal injuries including the following as well these complications and sequalae of the (se) condition (s), and attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

5

    a.  Breast cancer;

    b.  High cholesterol; and

    c.  Was otherwise injured.

5.      Plaintiff Kathleen Talotta has suffered from and continues to suffer from personal injuries including the following as well these complications and sequalae of the (se) condition (s), and attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

    a.  Breast cancer;

    b.  Diabetes;

    c.  High cholesterol;

    d.  Kidney failure;

    e.  Myelofibrosis; and

    f.  Was otherwise injured.

6.      Plaintiff Darlene Torrey has suffered from and continues to suffer from personal injuries including the following as well these complications and sequalae of the (se) condition (s), and attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

    a.  Breast cancer;

    b.  Diabetes; and

    c.  Was otherwise injured.

7.      Plaintiff Estate of Terry Donahue is the Estate of Decedent, Terry Donahue, who has suffered from and ultimately died as the result of personal injuries including the following as well these complications and sequalae of the (se) condition (s), and attendant conscious pain and

6

suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

    a.  Breast cancer;

    b.  High cholesterol; and

    c.  Was otherwise injured.

8.    Plaintiff Laura Rumbol has suffered from and continues to suffer from personal injuries including the following as well these complications and sequalae of the (se) condition (s), and attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

    a.  Kidney cancer;

    b.  Hyperlipidemia;

    c.  Pre-diabetes;

    d.  Gastro-intestinal conditions; and

    e.  Was otherwise injured.

9.    Plaintiff Peter Cappola has suffered from and continues to suffer from personal injuries including the following as well these complications and sequalae of the (se) condition (s), and attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

    a.  Prostate cancer;

    b.  Diabetes;

    c.  High Cholesterol;

    d.  Erectile dysfunction; and

    e.  Was otherwise injured.

10.    Plaintiff John Dagney has suffered from and continues to suffer from personal injuries including the following as well these complications and sequalae of the (se) condition (s), and attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

a.  Chronic Myelogenous Leukemia; and

b.  Was otherwise injured.

11.    Plaintiff Richard St. Petery has suffered from and continues to suffer from personal injuries including the following as well these complications and sequalae of the (se) condition (s), and attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

a.  Testicular cancer; and

b.  Was otherwise injured.

12.    Plaintiff Laura Skonetski has suffered from and continues to suffer from personal injuries including the following as well these complications and sequalae of the (se) condition (s), and attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

a.  Kidney cancer;

b.  Kidney failure;

c.  High Cholesterol; and

d.  Was otherwise injured.

13.    Plaintiff Nicholas Baud has suffered from and continues to suffer from personal injuries including the following as well these complications and sequalae of the (se) condition (s),

and attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

    a. Hodgkins's lymphoma; and

    b. Was otherwise injured.

14. Plaintiff Jami Cubbler has suffered from and continues to suffer from personal injuries including the following as well these complications and sequalae of the (se) condition (s), and attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

    a. Thyroid cancer; and

    b. Was otherwise injured.

15. Plaintiff Nichole Funk has suffered from and continues to suffer from personal injuries including the following as well these complications and sequalae of the (se) condition (s), and attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

    a. Myeloid Dysplastic Syndrome;

    b. Langerhans cell histiocytosis; and

    c. Was otherwise injured.

16. Plaintiff Albert Hinkson has suffered from and continues to suffer from derivative injuries. Albert Hinkson married Susan Hinkson in 1989, before Susan Hinkson's illness. Albert Hinkson is a resident of New Jersey and lives at 105 Hessian Avenue in the city of National Park. Susan Hinkson suffers from personal injuries, which as alleged in the Complaint, are proximately caused by Defendant's misconduct.

17.    As a consequence of Susan Hinkson's personal injuries, Albert Hinkson has also suffered damages including but not limited to:

   a. Loss of services associated with Susan Hinkson's illness, injury, and treatment, including but not limited to Susan Hinkson's inability to perform household services, e.g., cleaning and preparing meals;

   b. Economic expenses associated with Susan Hinkson's illness, injury, and treatment, including but not limited to significant missed work (at least four months) to attend doctor's appointments with Susan and care for her at home after her medical treatment;

   c. Loss of consortium, companionship, intimacy, pain, suffering, and emotional distress associated with the course of Susan Hinkson's injuries, illness, and treatment; and

   d. Was otherwise injured and damaged.

18.    Plaintiff John D. Hutchinson, Sr. has suffered from and continues to suffer from derivative injuries. John D. Hutchinson, Sr. married Theresa Hutchinson in 2015, before Theresa Hutchinson's illness and before her death. John D. Hutchinson, Sr. is a resident of New Jersey and lives at 28 Baynes Avenue, Gloucester City, NJ  08030. Theresa Hutchinson suffered from personal injuries, which as alleged in the Complaint, are proximately caused by Defendant's misconduct.

19.    As a consequence of Theresa Hutchinson's personal injuries, John D. Hutchinson, Sr. also has suffered damages including but not limited to:

   a. Loss of services associated with Theresa Hutchinson's illness, injury, and treatment, including but not limited to Theresa Hutchinson's inability to perform household services, e.g., gardening and home repairs, during her illness;

   b. Economic expenses associated with Theresa Hutchinson's illness, injury, and treatment, including but not limited to copays, missed work, lawn care service, and John D. Hutchinson, Sr.'s having to take early retirement to care for Theresa Hutchinson;

  c. Loss of consortium, companionship, intimacy, pain, suffering, and emotional distress associated with the course of Theresa Hutchinson's injuries, illness, and treatment; and

  d. Was otherwise injured and damaged.

20. Plaintiff Robert Talotta has suffered from and continues to suffer from derivative injuries. Robert Talotta married Kathleen Talotta in 2008, before Kathleen Talotta's illness. Robrt Talotta is a resident of Florida and lives at 8120 Chrismer Lane in the city of Weeki Wachee. Kathleen Talotta suffers from personal injuries, which as alleged in the Complaint, are proximately caused by Defendant's misconduct.

21. As a consequence of Kathleen Talotta's personal injuries, Robert Talotta also has suffered damages including but not limited to:

  a. Loss of services associated with Kathleen Talotta's illness, injury, and treatment, including but not limited to Kathleen Talotta's inability to perform household services including cooking, cleaning, laundry, and other daily household functions during the course of her illness and treatment;

  b. Economic expenses associated with Kathleen Talotta's illness, injury, and treatment, including but not limited to copays, missed work and out-of-pocket expenses;

  c. Loss of consortium, companionship, intimacy, pain, suffering, and emotional distress associated with the course of Kathleen Talotta's injuries, illness, and treatment; and

  d. Was otherwise injured and damaged.

22. Anthony Torrey married Darlene Torrey in 1988, before Darlene Torrey's illness. Anthony Torrey is a resident of New Jersey and lives at 38 Biscayne Boulevard in the city of Woodbury. Darlene Torrey suffers from personal injuries, which as alleged in the Complaint, are proximately caused by Defendant's misconduct.

23. As a consequence of Darlene Torrey's personal injuries, Anthony Torrey also has suffered damages including but not limited to:

a. Loss of services associated with Darlene Torrey's illness, injury, and treatment, including but not limited to Darlene Torrey's inability to perform household services, e.g., cleaning and preparing meals;

b. Economic expenses associated with Darlene Torrey's illness, injury, and treatment, including but not limited to missed work to attend medical and/or surgical procedures and appointments with Darlene and care for her at home after her medical treatment;

c. Loss of consortium, companionship, intimacy, pain, suffering, and emotional distress associated with the course of Darlene Torrey's injuries, illness, and treatment; and

d. Was otherwise injured and damaged.

24. George Rumbol married Laura Rumbol in 1996, before Laura Rumbol's illness. George Rumbol is a resident of New Jersey and lives at 1498 Manduit Street, West Deptford, New Jersey. Laura Rumbol suffers from personal injuries, which as alleged in the Complaint, are proximately caused by Defendant's misconduct.

25. As a consequence of Laura Rumbol's personal injuries, George Rumbol also has suffered damages including but not limited to:

a. Loss of services associated with Laura Rumbol's illness, injury, and treatment, including but not limited to Laura Rumbol's inability to perform household services she previously managed as a stay-at-home mother, including cooking, cleaning, laundry, and other daily household functions during the course of her illness and treatment;

b. Economic expenses associated with Laura Rumbol's illness, injury, and treatment, including but not limited to George Rumbol's loss of income from his music band due to his need to care for Laura, personally driving Laura to medical appointments, tests, and surgery, and out-of-pocket expenses for house cleaning, laundry, and meal services;

c. Loss of consortium, companionship, intimacy, pain, suffering, and emotional distress associated with the course of Laura Rumbol's injuries, illness, and treatment; and

d. Was otherwise injured and damaged.

12

26.     Natalie Coppola married Peter Coppola in 1993, before Peter Coppola's illness. Natalie Coppola is a resident of New Jersey and lives at 1669 Atkins Avenue, West Deptford, NJ 08086. Peter Coppola suffers from personal injuries, which as alleged in the Complaint, are proximately caused by Defendant's misconduct.

27.     As a consequence of Peter Coppola's personal injuries, Natalie Coppola also has suffered damages including but not limited to:

    a.  Loss of services associated with Peter Coppola's illness, injury, and treatment, including but not limited to Peter Coppola's inability to perform household services, e.g., home care, gardening, home repairs, and care for children during illness;

    b.  Economic expenses associated with Peter Coppola's illness, injury, and treatment, including but not limited to copays, missed work, and housekeeping services for multiple months associated with spouse's illness;

    c.  Loss of consortium, companionship, intimacy, pain, suffering, and emotional distress associated with the course of Peter Coppola's injuries, illness, and treatment; and

    d.  Was otherwise injured and damaged.

28.     Joseph R. Funk married Nicole Funk in 1992, before Nicole Funk's illness. Joseph R. Funk is a resident of New Jersey and lives at 9 Craig Drive, Deptford, NJ  08096. Nicole Funk suffers from personal injuries, which as alleged in the Complaint, are proximately caused by Defendant's misconduct.

29.     As a consequence of Nicole Funk's personal injuries, Joseph R. Funk also has suffered damages including but not limited to:

    a.  Loss of services associated with Nicole Funk's illness, injury, and treatment, including but not limited to her inability to perform household services, e.g. cleaning, upkeep, gardening, home repairs, care for children, and care for herself, during illness;

    b.  Economic expenses associated with Nicole Funk's illness, injury, and treatment, including but not limited to copays, missed work (took off for approximately 3

months after her transplant), and frequent travel along the Eastern United States seeking and/or receiving medical treatment associated with spouse's illness;

c. Loss of consortium, companionship, intimacy, pain, suffering, and emotional distress associated with the course of Nicole Funk's injuries, illness, and treatment; and

d. Was otherwise injured and damaged.

30. Plaintiff Dawn Harrell has suffered from and continues to suffer from personal injuries including the following, as well as the complications and sequalae of the (se) condition (s), attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

a. Ovarian cancer;

b. Bladder cancer; and

c. Was otherwise injured.

31. Plaintiff Barbara Mazzatenta suffers from personal injuries including but not limited to the following, as well the complications and sequalae of the (se) condition (s), attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

a. Thyroid cancer;

b. Cervical cancer;

c. Still births;

d. Cardiovascular disease; and

e. Was otherwise injured.

32. Plaintiff Sharon McCool has suffered from and continues to suffer from personal injuries including the following, as well as the complications and sequalae of the (se) condition

(s), attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

    a. Cholangial carcinoma (bile duct cancer);

    b. Diabetes;

    c. High cholesterol;

    d. Colitis;

    e. Thyroid disease; and

    f. Was otherwise injured.

33. Plaintiff Joseph Lucca has suffered from and continues to suffer from personal injuries including the following, as well as the complications and sequalae of the (se) condition (s), attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

    a. Bladder cancer;

    b. Prostate cancer;

    c. Diabetes;

    d. High cholesterol; and

    e. Was otherwise injured.

34. Plaintiff Mary Lucca has suffered from and continues to suffer from personal injuries including the following, as well as the complications and sequalae of the (se) condition (s), attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

    a. Thyroid disease;

    b. Heart disease;

c.    High cholesterol;

d.    Kidney disease; and

e.    Was otherwise injured.

35.    Plaintiff Robert White has suffered from and continues to suffer from personal injuries including the following, as well as the complications and sequalae of the (se) condition (s), attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

a.  Diabetes;

b.  Neuropathy;

c.  High blood pressure;

d.  High cholesterol; and

36.    Plaintiff LaVina White has suffered from and continues to suffer from personal injuries including the following, as well as the complications and sequalae of the (se) condition (s), attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

a.  Prolapse bladder;

b.  Endometriosis;

c.  Infertility and miscarriages;

d.  Edentulism;

e.  Irritable bowel syndrome; and

f.  Was otherwise injured.

37.    Plaintiff Gregorey Wenning has suffered from and continues to suffer from personal injuries including the following, as well as the complications and sequalae of the (se)

16

condition (s), attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

   a.  Testicular cancer; and

   b.  Was otherwise injured.

38.   Plaintiff Stacey Grundlock has suffered from and continues to suffer from personal injuries including the following, as well as the complications and sequalae of the (se) condition (s), attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

   a.  Diabetes;

   b.  Heart disease;

   c.  Chronic regional pain syndrome; and

   d.  Was otherwise injured.

39.   Plaintiff Artur Kofman has suffered from and continues to suffer from personal injuries including the following, as well as the complications and sequalae of the (se) condition (s), and attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

   a.  Diabetes;

   b.  Impaired vision;

   c.  High cholesterol; and

   d.  Was otherwise injured.

40.   Plaintiff Karina Kofman has suffered from and continues to suffer from personal injuries including the following, as well as the complications and sequalae of the (se) condition

(s), attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

    a. Diabetes;

    b. Impaired vision;

    c. Hashimoto's disease;

    d. Inflammatory arthritis; and

    e. Was otherwise injured.

41.    Plaintiff Diana Kofman has suffered from and continues to suffer from personal injuries including the following, as well as the complications and sequalae of the (se) condition (s), attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

    a. High cholesterol;

    b. Impaired vision;

    c. Miscarriages; and

    d. Was otherwise injured.

42.    Plaintiff Daniel Tarpley has suffered from and continues to suffer from personal injuries including the following, as well as the complications and sequalae of the (se) condition (s), attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

    a. Diabetes;

    b. Neuropathy;

    c. High cholesterol;

    d. Irritable bowel syndrome; and

e. Was otherwise injured.

43. Plaintiff Geraldine Doyle has suffered from and continues to suffer from personal injuries including the following, as well as the complications and sequalae of the (se) condition (s), attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

a. Rectal cancer;

b. Colitis;

c. Irritable bowel syndrome; and

d. Was otherwise injured.

44. Plaintiff William Doyle has suffered from and continues to suffer from personal injuries including the following, as well as the complications and sequalae of the (se) condition (s), attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

a. Prostate cancer;

b. Irritable bowel syndrome; and

c. Was otherwise injured.

45. Plaintiff Paula Trapuzzano has suffered from and continues to suffer from personal injuries including the following, as well as the complications and sequalae of the (se) condition (s), attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

a. Hyperlipidemia;

b. High cholesterol;

c. Burning mouth syndrome;

19

    d.  Thyroid nodules; and

    e.  Was otherwise injured.

46.    Plaintiff Ricky Toch has suffered from and continues to suffer from personal injuries including the following, as well as the complications and sequalae of the (se) condition (s), attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

    a.  Diabetes;

    b.  Kidney disease; and

    c.  Was otherwise injured.

47.    Plaintiffs Daniel Mazzatenta, Barbara Wenning, and Scott Turgeon, have sustained derivative injuries as a consequence of the expenditure of monies for the care and treatment of their injured relatives, for the loss of services from their injured relatives, and have experienced emotional distress as a consequence of their injured relatives' injuries and conditions.

48.    Daniel Mazzatenta married Barbara Mazzatenta in 1977, before Barbara Mazzatenta's illness. Daniel Mazzatenta is a resident of New Jersey and lives at 503 Allen Avenue, Gibbstown, New Jersey. Barbara Mazzatenta suffers from personal injuries, which as alleged in the Complaint, are proximately caused by Defendant's misconduct.

49.    As a consequence of Barbara Mazzatenta's personal injuries, Daniel Mazzatenta also has suffered damages including but not limited to:

    a.  Loss of services associated with Barbara Mazzatenta's illness, injury, and treatment, including but not limited to her inability to perform household services such as cleaning, laundry, gardening, lawn care, and other domestic tasks, which are being handled by her spouse. Due to her condition, she is unable to care for herself independently and requires assistance with daily activities and transportation to medical appointments;

20

b. Economic expenses associated with Barbara Mazzatenta's illness, injury, and treatment, including but not limited to unpaid time off work taken by her spouse to transport her to doctor's appointments and remain with her during hospital stays, as well as medical co-payments for treatment;

c. Loss of consortium, companionship, intimacy, pain, suffering, and emotional distress associated with the course of Barbara Mazzatenta's injuries, illness, and treatment; and

d. Was otherwise injured and damaged.

50.    Plaintiff Barbara Wenning has suffered from and continues to suffer from derivative injuries. Barbara Wenning married Gregorey Wenning in 2003, before Gregorey Wenning's illness. Gregorey Wenning suffers from personal injuries, which as alleged in the Complaint, are proximately caused by Defendant's misconduct.

51.    As a consequence of Gregorey Wenning 's personal injuries, Barbara Wenning has also suffered damages including but not limited to:

a. Loss of services associated with Gregorey Wenning's illness, injury, and treatment, including but not limited to Gregorey Wenning's inability to perform household services, e.g., cleaning, home repairs and maintenance;

b. Economic expenses associated with Gregorey Wenning's illness, injury, and treatment, including but not limited to travel expenses to attend doctor's appointments and medical treatments;

c. Loss of consortium, companionship, intimacy, pain, suffering, and emotional distress associated with the course of Gregorey Wenning's injuries, illness, and treatment; and

d. Was otherwise injured and damaged.

52.    Plaintiff Scott Turgeon has suffered from and continues to suffer from derivative injuries. Scott Turgeon married Stacey Grundlock in 2004, before Stacey Grundlock's illness. Stacey Grundlock suffers from personal injuries, which as alleged in the Complaint, are proximately caused by Defendant's misconduct.

21

53.     As a consequence of Stacey Grundlock's personal injuries, Scott Turgeon has also suffered damages including but not limited to:

   a.  Loss of services associated with Stacey Grundlock's illness, injury, and treatment, including but not limited to Stacey Grundlock's inability to perform household services;

   b.  Economic expenses associated with Stacey Grundlock's illness, injury, and treatment, including but not limited to significant missed work and lost employment due to time required to care for Stacey, travel expenses to attend doctor's appointments with Stacey and care for her at home after her medical treatment;

   c.  Loss of consortium, companionship, intimacy, pain, suffering, and emotional distress associated with the course of Stacey Grundlock's injuries, illness, and treatment; and

   d.  Was otherwise injured and damaged.

54.     Plaintiff Tracy Rebel has suffered from and continues to suffer from personal injuries including the following as well these complications and sequalae of the (se) condition (s), and attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

   a.  Breast cancer;

   b.  Endometriosis;

   c.  Cysts on breast tissue;

   d.  Cysts on kidney;

   e.  High cholesterol;

   f.  Pre-diabetes; and

   g.  Was otherwise injured.

55.     Plaintiff Celina Morton Burk suffers from personal injuries including but not limited to the following as well these complications and sequalae of the (se) condition (s), and

22

attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

    a. Ulcerative colitis;

    b. Endometriosis;

    c. Gastroesophageal reflux disease (GERD);

    d. Gastritis;

    e. Irritable bowel syndrome;

    f. Diverticulitis; and

    g. Was otherwise injured.

56. Plaintiff Elwood P. Martz, III, has suffered from and continues to suffer from personal injuries including the following as well these complications and sequalae of the (se) condition (s), and attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

    a. Prostate cancer;

    b. Diverticulitis;

    c. High cholesterol; and

    d. Was otherwise injured.

57. Plaintiff Marquis Moore has suffered from and continues to suffer from personal injuries including the following as well these complications and sequalae of the (se) condition (s), and attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

    a. Prostate cancer;

    b. Diverticulitis;

    c.  Gastroesophageal reflux disease (GERD);

    d.  High cholesterol; and

    e.  Was otherwise injured.

58.    Plaintiff Shawna Morris has suffered from and continues to suffer from personal injuries including the following as well these complications and sequalae of the (se) condition (s), and attendant conscious pain and suffering, social and emotional distress, mental anguish, loss of ability to enjoy life's pleasures and disability:

    a.  Myeloproliferative neoplasms positive for Janus kinase 2 (JAK2) gene mutation; and

    b.  Pre-diabetes; and

    c.  Was otherwise injured.

59.    Plaintiffs Everette Burk and Lucy Martz have sustained derivative injuries as a consequence of the expenditure of monies for the care and treatment of their injured spouses, for the loss of services from their injured spouses, and have experienced emotional distress as a consequence of their injured relatives' injuries and condition.

60.    Plaintiff Lucy Martz has suffered from and continues to suffer from derivative injuries. Lucy Martz married Elwood P. Martz, III, in 1968, before Elwood P. Martz, III's illness. Lucy Martz resides in New Jersey as stated below. Elwood P. Martz, III suffers from personal injuries, which as alleged in the Complaint, are proximately caused by Defendant's misconduct.

61.    As a consequence of Elwood P. Martz, III's personal injuries, Lucy Martz has also suffered damages including but not limited to:

    a.  Loss of services associated with Elwood P. Martz, III's illness, injury, and treatment, including but not limited to Elwood Martz, III's inability to perform household services, including lawn care and home repairs;

24

b. Economic expenses associated with Elwood P. Martz, III's illness, injury, and treatment, including but not limited to significant missed work time to attend doctor's appointments with Elwood, travel costs to attend said appointments, and treatments and care for him at home in connection with his medical treatment;

c. Loss of consortium, companionship, intimacy, pain, suffering, and emotional distress associated with the course of Elwood P. Martz, III's injuries, illness, and treatment; and

d. Was otherwise injured and damaged.

62. Plaintiff Everette Burk lives in New Jersey, as stated below, and has suffered from and continues to suffer from derivative injuries. Everette Burk married Celina Morton Burk in 2010, before Celina Morton Burk's illness. Celina Morton Burk suffers from personal injuries, which as alleged in the Complaint, are proximately caused by Defendant's misconduct.

63. As a consequence of Celina Morton Burk's personal injuries, Everette Burk has also suffered damages including but not limited to:

a. Loss of services associated with Celina Morton Burk's illness, injury, and treatment, including but not limited to Celina Morton Burk's inability to perform household services, including cleaning and preparing meals, which at times necessitated hiring professional cleaners at their home;

b. Economic expenses associated with Celina Morton Burk's illness, injury, and treatment, including but not limited to significant missed work to visit and care for Celina, particularly while Celina was hospitalized for approximately one month, travel expenses, including parking, tolls, and meals while visiting Celina during her hospitalization, and travel expenses to attend doctor's appointments with Celina and care for her at home after her medical treatment;

c. Loss of consortium, companionship, intimacy, pain, suffering, and emotional distress associated with the course of Celina Morton Burk 's injuries, illness, and treatment; and

d. Was otherwise injured and damaged.

64. Olivia Blymer suffered from and ultimately died from personal injuries including but not limited to the following:

a. Ovarian cancer;

25

b. Liver cancer;

c. Oophorectomy;

d. Salpingectomy;

e. Lumbarization;

f. Pain and suffering,

g. Emotional distress,

h. Disability;

i. Loss of enjoyment of life's pleasures; and

j. Was otherwise injured.

65.    Riley Blymer suffers from personal injuries including but not limited to the following:

a. Birth defects, Ollier's disease[2];

a. Eosinophilic esophagitis[3];

b. Pain and suffering;

c. Emotional distress;

d. Disability;

e. Loss of enjoyment of life's pleasures; and

f. Was otherwise injured.

---

[2] Ollier's disease, also known as enchondromatosis is a non-hereditary bone disorder characterized by multiple benign cartilage growths called enchondromas within the bones. These growths cause bone deformities, shortening of limbs, and fractures. Enchondromas in Ollier's disease have a potential for malignant transformation, with a risk of developing chondrosarcoma.

[3] Eosinophilic esophagitis (EoE) is a chronic incurable condition where the esophagus becomes inflamed due to an overabundance of eosinophils, a type of white blood cell. This inflammation can cause difficulty swallowing, food impaction, and other digestive issues.

66.     Plaintiffs Kellyann Blymer and James Blymer, the parents of Olivia and Riley Blymer, have sustained derivative injuries as a consequence of the expenditure of monies for the care and treatment of Olivia Blymer and Riley Blymer, for the loss of services from Olivia and Riley, and have experienced emotional distress as a consequence of their daughter Olivia's death and their daughter Riley's injuries and condition.

67.     Plaintiff Anthony Casazza suffers from personal injuries including but not limited to the following:

  a. Ulcerative colitis;

  b. Rectal mucinous adenocarcinoma (rectal cancer);

  c. Precancerous polyps;

  d. Ileostomy;

  e. Anxiety;

  f. Social and emotional distress;

  g. Profound pain and suffering and mental anguish;

  h. Loss of the ability to enjoy life's pleasures; and

  i. Was otherwise injured.

### III. THE SUBSTANCES PROXIMATELY CAUSING PLAINTIFFS' INJURIES

68.     Plaintiffs' and the Decedents' injuries and derivative damages were foreseeably caused by Defendant's misconduct, which resulted in the release of per-and polyfluoroalkyl substances to which Plaintiffs and the Decedents were exposed.

69.     Hereafter per- and polyfluoroalkyl substances ("PFAS"), including what are sometimes called "legacy" PFAS that Defendants claim to no longer use or sell (such as Perfluorooctanoic acid or PFOA, NaPFO, perfluorooctanesulfonic acid or PFOS, and

perfluorononanoic acid or PFNA), and what are sometimes referred to as alternative or replacement PFAS (such as "GenX") are collectively referred to as "PFAS".

70.     PFAS individually and in mixtures have the capacity to cause and/or to aggravate the injuries and disorders suffered by Plaintiffs as well as:

a.  Adverse reproductive outcomes including but not limited to infertility, subfertility, premature births, spontaneous abortion, still birth, birth defects, developmental delays, genetic damage, and embryonic tumors;

b.  Malignancies, tumors and neoplasms including but not limited to breast cancer, kidney cancer, brain cancer, ovarian cancer, bladder cancer, sarcoma, testicular cancer, pancreatic cancer, colon cancer, liver cancer, and embryonal tumors; and

c.  Non-malignant disorders including, diabetes, gestational diabetes, kidney disease, kidney failure, peripheral neuropathy, obesity, thyroid disease, endometriosis, elevated cholesterol, coronary artery disease, impaired vision, and scoliosis.

71.     PFAS have the capacity to act in an additive and/or synergistic fashion such that exposures to PFAS and mixed exposures to the PFAS and other toxic substances enhance their capacity to inflict and/or exacerbate the harm(s) of the type described above.

72.     The mechanisms by which PFAS inflict harm include but are not limited to:

a.  Apoptosis (cell death);

b.  Oxidative stress;

c.  Genotoxicity (spontaneous or *de novo* mutation);

d.  Epigenetic change;

e.  Diminished cellular nourishment;

f.  Impaired cell-to-cell communication;

g.  Endocrine disruption;

h.  Impaired or excessive immune response;

i.  Intrauterine growth retardation;

j.   Impaired organogenesis;

k.   The capacity to cross placental and brain barriers; and

l.   Bio-persistence.

73.   There is no safe level of exposure to PFAS.

74.   While exposure to the PFAS (e.g., quantum of exposure, duration(s) of exposure and timing of exposure relative to the adverse outcome) typically operate along a dose- response gradient such that increases in the amount and duration of exposure increase the potential for harm, even a single exposure in a small amount has the capacity to cause or aggravate the injuries sustained by Plaintiffs, and cause other injuries.

75.   Plaintiffs do not assert that they were exposed to aqueous film-forming foam (AFFF). Plaintiffs disclaim any such exposure and disclaim recovery of any portion of their damages determined by a factfinder to have been caused by exposure to AFFF.

76.   Plaintiffs do not assert that they were exposed to chemicals arising out of any contracts Defendants had with the federal government in the 1940s or 1950s. Plaintiffs disclaim any such exposure and disclaim recovery of any portion of their damages determined by a factfinder to have been caused by such exposures.

## IV. THE PARTIES

### A.  The Plaintiffs

77.   Gina Strohm was born on August 6, 1954.  From 2003 until present, Gina Strohm has lived at 409 Paris Avenue in Brooklawn, New Jersey.

78.   Susan Hinkson was born on March 17, 1966. From the time of her conception and continuing through to 1989, Susan Hinkson lived at 805 Hessian Avenue in National Park, New

29

Jersey. From 1989 until present, Susan Hinkson has lived with her husband Albert Hinkson at 105 Hessian Avenue in National Park, New Jersey.

79.    Theresa Hutchinson was born on May 15, 1952.  From 1959 to 1988 Theresa Hutchinson resided at various addresses in Gloucester City, New Jersey. In 2000, Theresa Hutchinson and her husband John D. Hutchinson, Sr. began residing at 28 Baynes Avenue in Gloucester City, New Jersey, where they lived together for twenty-four years under her death on November 17, 2024, after which John D. Hutchinson Sr. became Executor of the Estate of Theresa Hutchinson.

80.    Rozalia DiMarco was born on November 4, 1951.  From 2013 until present, Rozalia DiMarco has lived at 1410 Sweedeboro Avenue, Apt 2, in Paulsboro, New Jersey.

81.    Kathleen Talotta was born on June 24, 1963.  From 2009 until 2023, Kathleen Talotta and her husband Robert Talotta lived at 416 Highland Avenue, in Westville, New Jersey, and currently reside together at 8120 Chrismer Lane, Weki Wachee, Florida.

82.    Darlene Torrey was born on August 8, 1951.  From 1988 until present Darlene Torrey has resided in Woodbury, New Jersey and currently lives with her husband Robert Torrey at 38 Biscayne Boulevard Woodbury, New Jersey.

83.    Terry Donahue was born on September 9, 1956.  From 2010 until her death on December 12, 2025, she lived in Westville, New Jersey and last residing at 24 Avon Avenue, Westville, New Jersey. Following Terry Donahue's death, Terry's daughter, ANTOINETTE CANZANESE, who resides at 24 Avon Avenue, Westville, New Jersey, became Executor of the Estate of Terry Donahue.

84.    Laura Rumbol was born on February 21, 1963.  From 1995 until present she has lived with her husband George Rumbol at 1498 Manduit Street, West Deptford, New Jersey.

85.     Peter Cappola was born on October 27, 1964.  From 1964 until 2001, Peter Cappola lived in Glouster City, New Jersey and from 2001 until present has lived with his wife Natalie Cappola at 1669 Atkins Avenue, West Deptford, New Jersey.

86.     John Dagney was born on June 27, 1967.  He has lived his entire life in Deptford, New Jersey and from 1990 until present he has lived at 30 Grant Street, Deptford, New Jersey.

87.     Richard St. Petery was born on July 17, 1982.  He has lived his entire life in Thorofare, New Jersey where he has lived at 315 Leonard Lane, and currently resides at 161 Crown Point Road, Thorofare, New Jersey.

88.     Laura Skonetski was born on May 28, 1959.  From 1997 until present she has lived at 435 Billingsport Road, Paulsboro, New Jersey.

89.     Nicholas Baud was born on April 27, 1994.  From 1997 until present he has lived at 117 Westwood Hill Road, West Deptford, New Jersey.

90.     Jami Cubbler was born on September 9, 1977.  From 2000 until present she has lived at 209 Logan Street, Woodbury, New Jersey.

91.     Nicole Funk was born on January 20, 1971.  From 1976 to 2014 Nicole Funk lived primarily in West Deptford and from 2014 until present has lived with her husband Joseph Funk at 9 Craig Street, Westville, New Jersey.

92.     Dawn Harrell was born on July 6, 1960.  From 2015 until present, Dawn Harrell has lived at 409 Paris Avenue in Brooklawn, New Jersey.

93.     Barbara Mazzatenta was born on July 18, 1960. Barbara Mazzatenta has lived her entire life in Paulsboro and Gibbstown, New Jersey and currently resides at 503 Allen Avenue, Gibbstown, New Jersey.

94.     Daniel Mazzatenta was born on March 23, 1956. He resides with his wife Barbara Mazzatenta at 503 Allen Avenue, Gibbstown, New Jersey.

95.     Sharon McCool was born on March 23, 1964. Sharon McCool was born and raised in West Deptford, New Jersey and since 2001 she has resided at 12 Pleasant Valley Way Drive, West Deptford, New Jersey.

96.     Joseph Lucca was born on July 21, 1936. From 1989 until present-day Joseph Lucca has resided continuously at 609 Winding Way, Westville, New Jersey.

97.     Mary Lucca was born on August 18, 1937. From 1989 until present-day Mary Lucca has resided continuously at 609 Winding Way, Westville, New Jersey.

98.     Robert White was born on June 30, 1963. Since 1998 Robert White has lived continuously at 1703 5th Street, West Deptford, New Jersey.

99.     Lavina White was born on September 28, 1959. Since 1998, Lavina White has lived continuously at 1703 5th Street, West Deptford, New Jersey.

100.    Gregorey Wenning was born on September 8, 1969. Gregorey Wenning lived in Mantua, New Jersey from 2004 to 2019, and from 2019 to present has lived at 6 Viereck Road (previously known as 360 Swedesboro Road), Swedesboro, New Jersey.

101.    Barbara Wenning was born on March 11, 1969. She resides with her husband Gregorey Wenning at 6 Viereck Road (previously known as 360 Swedesboro Road), Swedesboro, New Jersey.

102.    Stacey Grundlock was born on June 14, 1968. Stacey Grundlock was born and raised in West Deptford, New Jersey and has lived there for most of her life and currently resides at 44 Budd Boulevard, West Deptford, New Jersey.

32

103.    Scott Turgeon was born on May 28, 1962. He resides with his wife Stacey Grundlock at 14 Budd Boulevard, West Deptford, New Jersey.

104.    Artur Kofman was born on November 12, 1966.  Since 2002 Artur Kofman has resided continuously at 1125 Tatum Street, Woodbury, New Jersey.

105.    Karina Kofman was born on July 22, 2000. Since 2002 Karina Kofman has resided continuously at 1125 Tatum Street, Woodbury, New Jersey.

106.    Diana Kofman was born on April 21, 1973. Since 2002 Diana Kofman has resided continuously at 1125 Tatum Street, Woodbury, New Jersey.

107.    Daniel Tarpley was born on May 26, 1973.  Since 2020 Daniel Tarpley has lived in Woodbury and Westville and currently resides at 712 Broadway, Westville, New Jersey.

108.    Geraldine Doyle was born on March 28, 1944.  Since 1995 Geraldine Doyle has lived at 626 Bismark Court, Mantua, New Jersey.

109.    William Doyle was born on February 15, 1935.  Since 1995 William Doyle has lived at 626 Bismark Court, Mantua, New Jersey.

110.    Paula Trapuzzano was born on June 30, 1964.  From 1997 until present Paula Trapuzzano has lived at114 Stanley Avenue, Westville, New Jersey.

111.    Ricky Toch was born on Aust 28, 1989.  From December 2018 until present, Ricky Toch has lived continuously at 138 Stanley Avenue, Westville, New Jersey.

112.    Tracy Rebel was born on December 15, 1973.  She has lived in Westville, New Jersey her entire life, currently residing at 134 Stanley Avenue, Westville, New Jersey, where she has lived since 1998.

33

113. Celina Morton Burk was born on June 8, 1967. Celina Morton Burk has lived her entire life in Camden and Gloucester counties and has lived in West Deptford, New Jersey for the past twenty-two years and currently resides at 93 Highbridge Lane, Thorofare, New Jersey.

114. Everett Burk was born on March 3, 1969. He is married to Celina Morton Burk and resides with her at 93 Highbridge Lane, Thorofare, New Jersey.

115. Elwood P. Martz, III, was born on October 25, 1946.  With the exception of the time several decades ago when he was in the service of the United States Army, Elwood Martz, III, lived from birth until 2018 in Camden County. Since 2018 he has resided at 265 Tony Circle, Mantua, New Jersey.

116. Lucy Martz was born on July 19, 1948. She is married to Elwood P. Martz, III, and resides with him at 265 Tony Circle, Mantua, New Jersey.

117. Marquis Moore was born on June 28, 1969.  From 1969 until 2004 Marquis Moore lived in Camden County, New Jersey, in Gloucester City and Oaklyn. From 2005 until 2016 he lived in Bridgeport, New Jersey, before moving back to Oaklyn, New Jersey from 2016 - 2018. Since 2018 Marquis Moore has resided continuously at 65 Enlow Place, Pennsville, New Jersey.

118. Shawna Morris was born on March 19, 1987.  Since 2010 Shawna Morris has lived in Westville and Woodbury New Jersey. Shawna Morris currently resides at 309 Stone Road, Lindenwold, New Jersey.

119. Olivia Blymer, daughter of James and Kellyann Blymer, was born on March 30, 2005 and died on May 13, 2025, and her mother KELLYANN BLYMER, who resides at 100 Timber Boulevard, Brooklawn, New Jersey is now Administrator Ad Prosequendum of Olivia Blymer's Estate.

34

120.    Riley Blymer, daughter of James and Kellyann Blymer, was born on February 8, 2008.

121.    From the time of their conceptions and continuing through to the diagnoses of their various diseases, Olivia Blymer and Riley Blymer lived at 100 Timber Boulevard in Brooklawn, New Jersey in Camden County.

122.    James Blymer lived at 100 Timber Boulevard in Brooklawn, New Jersey from about 2003 until 2010.

123.    Kellyann Blymer lived at 100 Timber Boulevard, Brooklawn, New Jersey from approximately 2003 to present, including but not limited to during her pregnancies with Olivia and Riley, during which years, she and James also were exposed to the Toxins.

124.    Anthony Casazza was born on March 12, 1988.

125.    From the time of his conception and continuing through to 1989, Anthony Casazza lived at 5205 Apple Lane Forest Creek Lane in West Deptford, New Jersey, and his parents also resided at that address prior to his birth.

126.    From 1989 until January 2019, Anthony Casazza lived at 307 Eighth Street in West Deptford, New Jersey.

127.    From January 2019 until March 2023, Anthony Casazza lived at 314 Heather Drive North in West Deptford, New Jersey.

128.    From March 2023 until present Anthony Casazza has lived at 1122 Mercy Street in Philadelphia, Pennsylvania.

129.    Antoinette Canzanese, who resides at 24 Avon Avenue, Westville, New Jersey, is the daughter of Decedent Terry Donahue, and Executor of the ESTATE OF TERRY DONAHUE.

**A.  The Defendant**

35

130.    Defendant The 3M Company Inc. ("3M") is a corporation duly organized under the laws of the State of Delaware with its principal place of business at 2501 Hudson Road, Maplewood, MN 55144.

131.    Defendant 3M supplied PFAS for use at the facility known as the "West Deptford" facility, "Thorofare", or the "Leonard Lane" Facility in southern New Jersey to which Plaintiffs were exposed.

## V.  JURISDICTION AND VENUE

132.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 since none of the Plaintiffs are domiciled in the same state as any Defendant and the amount in controversy exceeds $75,000.

133.    Venue is proper in this Court pursuant to 28 U.S.C. § 139l(b)(2) since a substantial part of the events or omissions giving rise to the claim occurred in this district.

134.    Defendant 3M is subject to personal jurisdiction in this case because, at all times relevant to this litigation, 3M produced, manufactured, marketed, distributed, and/or sold PFAS or products containing PFAS to customers throughout New Jersey and Plaintiffs' claims arise from and relate to 3M's substantial contacts in New Jersey.

## VI. STATEMENT OF FACTS

135.    Plaintiffs Gina Strohm, Susan Hinkson, Estate of Theresa Hutchinson, John D. Hutchinson, Sr., Rozalia Dimarco, Kathleen Talotta, Darlene Torrey, Estate of Terry Donahue. Laura Rumbol, Peter Cappola, John Dagney, Richard St. Petery, Laura Skonetski, Nicholas Baud, Jami Cubbler, Nicole Funk, Dawn Harrel, Barbara Mazzatenta, Sharon Mccool, Joseph Lucca, Mary Lucca, Robert White, Lavina White, Gregorey Wenning, Stacey Grundlock, Artur Kofman, Karina Kofman, Diana Kofman, Daniel Tarpley, Geraldine Doyle, William Doyle, Paula Trapuzzano, Ricky Toch, Tracy Rebel, Celina Morton Burk, Elwood P. Martz, III, Marquis Moore,

36

Shawna Morris, the Estate of Olivia Blymer, Kellyann Blymer, James Blymer, Riley Blymer, and Anthony Casazza suffered from personal injuries, pain and suffering, emotional distress, disability, and loss of enjoyment of life's pleasures, and in the cases of the Estates, their Decedents Terry Donahue, Olivia Blymer, and Theresa Hutchinson suffered from personal injuries, pain and suffering, emotional distress, disability, and loss of enjoyment of life's pleasures, and also death, as discussed above.

136. These injuries and the Decedents' deaths, and Daniel Mazzatenta, Barabara Wenning, Albert Hinkson, John D. Hutchinson, Sr., Robert Talotta, Anthony Torrey, George Rumbol, Natalie Coppola, Joseph Funk, Lucy Martz, John D. Hutchinson Sr., Everett Burk, Scott Turgeon, Antoinette Canzanese, Kellyann Blymer and James Blymer's derivative damages were proximately caused by Defendant's misconduct, including Defendant's intentional manufacturing, design, sale, provision, use, discharge, release and/or disposal of PFAS to which Plaintiffs and Decedents were exposed.

137. The sections that follow detail some of the acts and omissions proximately causing the contamination of Plaintiffs' community and the injuries from which they suffer and the Decedents suffered.

## A. Poly- and perfluoroalkyl Substances ("PFAS")

138. Plaintiffs' injuries and derivative damages and the Decedents' illnesses, injuries, and deaths described above all were proximately caused by the Defendant's misconduct, including their intentional manufacturing, design, sale, provision, use, discharge, and/or disposal of PFAS, including NaPFO.

139. The United States Environmental Protection Agency ("EPA") has identified 3M as the dominant global producer of PFOA and related chemicals.

140.    3M manufactures at least eighty-five (85%) percent of total worldwide volumes of PFOA and related chemicals.

141.    Poly- and perfluoroalkyl substances ("PFAS") are man-made chemicals.

142.    PFAS have been manufactured and used in the United States since the 1940s.

143.    PFAS have fire-resistant properties.

144.    PFAS act as oil, grease, and water repellants.

145.    PFAS have been used to make many household products such as Teflon®, Gore-Tex®, Stainmaster®, Scotchgard®, and Tyvek®.

146.    PFAS compounds are a substantial threat to the environment and human health.

147.    Some PFAS have been classified as carcinogenic.

148.    Studies report that PFAS exposure have the capacity to cause illness and injuries including but not limited to testicular cancer, kidney cancer, breast cancer, brain cancer, liver cancer, autoimmune disorders, endocrine disorders, reproductive harm, developmental and genetic defects to fetuses, developmental defects including to breastfed babies, reduced vaccine response, increased cholesterol, and increased liver enzymes.

149.    PFAS compounds are resistant to degradation.

150.    PFAS compounds persist indefinitely in the environment.

151.    PFAS compounds bioaccumulate in living tissue.

152.    People who consume PFAS via drinking water and are otherwise exposed accumulate increasing concentrations of PFAS in their blood.

153.    For decades, Defendant has known (or should have known) of the highly toxic characteristics of PFAS.

154. The New Jersey Department of Environmental Protection ("NJDEP") has devoted and is continuing to expend substantial resources to identify and investigate the presence of PFAS in New Jersey's environment, as well as monitor, treat, clean up, and/or remove PFAS in impacted areas.

155. The NJDEP has recognized that PFAS "can cross the placenta and reach the developing fetus. When drinking water is contaminated, PFAS exposures to infants from prepared formula and especially through breast milk are much higher than in adults. These higher exposures are of concern because the fetus and infant are sensitive to the developmental effects of PFAS."

156. NJDEP also has recognized that PFAS including PFOA, PFOS and PFNA cause adverse health effects.

157. The New Jersey Drinking Water Quality Institute Health Effects Subcommittee has concluded that PFOA, PFOS and PFNA cause adverse health effects.

158. In 2009, EPA issued preliminary health advisory values for PFOA and PFOS in drinking water of 400 parts per trillion ("ppt") and 200 ppt, respectively.

159. In 2016, EPA lowered its advisories for PFOA and PFOS to 70 ppt collectively total in further recognition of their extreme danger at even the most miniscule doses.

160. In 2018 the United States Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR") released draft minimum risk levels (the amount of a chemical a person can eat, drink, and breath each day without a detectable health risk) of 21 ppt for PFOA and PFNA, and 14 ppt for PFOS.

161. NJDEP has adopted a specific groundwater Quality Standard ("GWQS") of 10 ppt for PFNA and a Maximum Contaminant Level ("MCL") of 13 ppt.

162.    On March 13, 2019, the NJDEP established interim specific groundwater quality criteria for PFOA and PFOS of 10 ppt.

163.    NJDEP has proposed adding PFOA and PFOS to the List of Hazardous Substances.

164.    NJDEP also issued a Statewide PFAS Directive, Information Request and Notice to Insurers against entities including Defendant The 3M Company, "to notify them that the Department believes them to be responsible for the significant contamination of New Jersey's natural resources, including the air and waters of the State, with poly- and perfluoroalkyl substances ("PFAS")…" which encompass the air and water utilized by plaintiff. Attached hereto as **Exhibit A** is a true and correct copy of the NJDEP Directive.

165.    NJDEP  declared that "The 3M Company ("3M") put their profits above the public health, safety, and the environment of New Jersey."

166.    The NJDEP sued companies including Defendant, seeking to compel action to clean up the contamination at and around the site, including addressing impacts to drinking water, reimbursing the State for the costs of work that the NJDEP had already undertaken, and paying damages to the State to compensate the public for the injuries to natural resources caused by the facility's operations.

167.    New Jersey's Attorney General and NJDEP Commissioner has announced a settlement of up to $450 million with 3M to resolve the State's lawsuits and a Statewide Directive to address damage to the State's water and other natural resources from PFAS chemicals.

168.    Defendant committed acts and omissions with respect to PFAS with actual malice and/or with a wanton and willful disregard of people who foreseeably might be harmed by those acts or omissions.

40

169. This conduct was performed with greed and in callous disregard of the public health as well as Plaintiffs' health, life, and well-being, in order to maximize profit, avoid necessary expense, to promote sales of their products and to reduce or eliminate their obligations to otherwise remediate or prevent the discharge of PFAS into the environment and Plaintiffs' water and private wells.

**B. Defendant's Contamination of Groundwater and Drinking Water**

170. For decades, Defendant knew or should have known of the severe and adverse health and environmental effects and impacts of PFAS.

171. Despite that knowledge, Defendant continued to use PFAS in their products and release them into the environment.

172. From as early as the 1970s, Defendant 3M knew that PFOA and PFOS were harmful to people and the environment based on its own studies.

173. Defendant 3M knew that PFAS had the capacity to and foreseeably would leach into groundwater and contaminate the environment.

174. As early as 1960, an internal 3M memo admitted that its chemicals "[would] eventually reach the water table and pollute domestic wells."

175. 3M actively sought to suppress scientific research on the hazards associated with PFAS products.

176. 3M intentionally mounted a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health, and environmental risks of its PFAS products.

177. At least one scientist funded by 3M reported his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

41

178.    In 2006, the NJDEP conducted its first statewide occurrence study of PFAS in drinking water.

179.    That study revealed that 65% of sampled drinking water sources had PFOA compounds present, and 30% had PFOS compounds present.

180.    In the samples tested, PFOA was detected up to 100 ppt, PFOS was detected up to 43 ppt, and PFNA was detected up to 96 ppt.

181.    NJDEP sampled 992 private wells as of June 2018 for PFAS and detected the following:

   a.  PFOA in 427 wells (43%) with 284 of those wells having levels of PFOA exceeding the proposed MCL for PFOA; and

   b.  PFOS in 304 wells (31%) with 40 of those wells having levels of PFOS exceeding the proposed MCL for PFOS.

182.    NJDEP also issued a Statewide PFAS Directive, Information Request and Notice to Insurers against entities including Defendant The 3M Company "to notify them that the Department believes them to be responsible for the significant contamination of New Jersey's natural resources, including the air and waters of the State, with poly- and perfluoroalkyl substances ("PFAS") ... " which encompass the air and water utilized by plaintiffs. Attached hereto as Exhibit A is a true and correct copy of the NJDEP Directive.

   C.  **The West Deptford/Thorofare/Leonard Lane Facility**

183.    The company Solvay has been the owner and operator of a manufacturing facility located at 10 Leonard Lane, West Deptford, NJ 08085 from 1990 to present (the "West Deptford"/"Thorofare"/"Leonard Lane" Facility).

184.    Solvay manufactured polyvinylidene fluoride ("PVDF"), which is another PFAS compound, at the West Deptford facility.

42

185.   PVDF is a specialty plastic used in conjunction with lithium batteries, medical and defense uses, semi-conductors, or other instances when a higher level of purity is required.

186.   For years, including between approximately 1995 and 2003, the West Deptford Facility used as a surfactant sodium perfluorooctanoate (NaPFO) that was supplied to it by Defendant 3M.

187.   NaPFO degrades into PFOA.

188.   As a result of its operations, and of 3M's provision for years of vast amounts of NaPFO to the facility, the West Deptford Facility foreseeably released vast amounts of PFAS including PFOA into the surrounding air, water and soil contaminating the site, off-site properties including Plaintiffs' and Decedents', and New Jersey's natural resources.

**D. Defendant's Contamination of Groundwater, Surface Water, Drinking Water, Air and Soil**

189.   For decades, Defendant knew or should have known of the severe and adverse health and environmental effects and impacts of PFAS.

190.   Despite that knowledge, Defendant continued to use PFAS in products, and to sell and supply PFAS-containing products including NaPFO to the West Deptford Facility, which foreseeably emitted PFAS into the environment, foreseeably harming the environment and local residents.

191.   From as early as the 1970s, Defendant 3M knew that PFOA and PFOS were harmful to people and the environment based on its own studies and review of relevant scientific and medical literature.

192.   Defendant 3M knew that PFAS had the capacity to and foreseeably would leach into groundwater and contaminate the environment.

193. As noted, 3M actively sought to suppress scientific research on the hazards associated with PFAS products.

194. As noted, at least one scientist funded by 3M reported his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

195. Defendant failed to disclose the risks to regulators, the public, or the Plaintiffs.

196. As discussed, NJDEP sampled 992 private wells as of June 2018 for PFAS and detected the following:

   a. PFOA in 427 wells (43%) with 284 of those wells having levels of PFOA exceeding the proposed MCL for PFOA; and

   b. PFOS in 304 wells (31%) with 40 of those wells having levels of PFOS exceeding the proposed MCL for PFOS.

197. The contamination was detected in wells that supplied drinking water to both residential and industrial areas.

198. Studies show that exposure to PFAS have the capacity to cause *inter alia* testicular cancer, kidney cancer, liver cancer, autoimmune disorders, endocrine disorders, genetic damage, breast cancer, endometriosis, diabetes, developmental birth defects to fetuses, gastrointestinal illness, brain tumors, reproductive harm, developmental defects including to breastfed babies, reduced vaccine response, increased cholesterol, and increased liver enzymes.

199. The routes of exposure to which Plaintiffs were was exposed to PFAS include but are not limited to:

   a. the ingestion of drinking water;

   b. the inhalation of vapors and particulate matter; and

    c.  dermal contact and skin absorption.

200.    Defendant's misconduct and the resulting wrongful exposures proximately caused Plaintiffs' injuries and damages as described above. As a consequence, Defendant is liable to Plaintiffs for both compensatory and punitive damages.

201.    At all material times hereto, Defendant 3M

    a.  knew or should have known that their PFAS would contaminate the environment including the air, soil, and groundwater and contaminate the drinking, neighborhood, and household water of residents in surrounding communities, including Plaintiffs and Decedents;

    b.  knew or should have known that PFAS were hazardous substances and the reckless, and/or wanton and willful discharge of those chemicals into the environment and surrounding communities would eventually reach Plaintiffs' and Decedents' property, soil, air, and drinking and household water wells thus exposing Plaintiffs and Decedents and others to high and injurious concentrations of the hazardous chemicals;

    c.  knew or should have known of the health and environmental impacts of PFAS for decades but continued to use them in products and release them into the environment;

    d.  knew or should have known that PFOA and NaPFO and their constituents were harmful to people and the environment based on their own studies and research of others;

    e.  despite actual or constructive knowledge of its chemicals' toxicity to humans and the environment, proactively sought to conceal that information from the public;

    f.  despite actual or constructive knowledge of its chemicals' toxicity to humans and the environment, Defendants proactively misrepresented the chemicals' hazardous properties, including knowingly and purposefully withholding material information from regulators and governmental agencies;

    g.  even after Defendants acquired actual knowledge that they were causing groundwater, soil, air, and drinking water contamination and thus exposing nearby residents to its PFAS, including Plaintiffs and Decedents, Defendants continued their operations and continued discharging these PFAS into the environment and exposing residents in surrounding communities, including Plaintiffs and Decedents, in reckless and conscious disregard for the serious health and safety risks associated with such exposure;

h.  committed acts and omissions with respect to PFAS with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions;

i.  knowingly, continuously, and with conscious indifference to the rights of residents in surrounding communities, including Plaintiffs and Decedents, to have access to clean air, soil, water, and drinking water, caused, allowed, or permitted the discharge of large quantities of PFAS into the environment, air, soil, and groundwater, had no justification for doing so, and made no effective effort to alleviate the problem or warn the surrounding community; and

j.  engaged in the above conduct motivated by greed and in deliberate and knowing disregard of their duties to Plaintiffs and Decedents and all similarly situated individuals.

202.  Defendant's acts and omissions as set forth in the preceding paragraphs demonstrate their reckless and conscious disregard the health, safety, and welfare, of residents in the community, including Plaintiffs and Decedents.

203.  As a direct and proximate result of Defendant's conscious and deliberate disregard for the health, safety, and welfare of residents in surrounding communities, including Plaintiffs and Decedents, suffered illness, injuries, emotional distress, medical costs and economic damages and in the Decedents' case death, as described above, and Derivative Plaintiffs suffered and continue to suffer emotional distress and other damages, economic and noneconomic, as set forth above.

204.  The aforesaid conduct of Defendant was committed with knowing, conscious, and deliberate disregard for the rights and safety of residents in surrounding communities, including Plaintiffs and Decedents, thereby entitling them to punitive damages in an amount appropriate to punish Defendant and deter them from similar conduct in the future.

205.  Defendant's actions showed willful misconduct, malice, fraud, wantonness, and/or oppression, and demonstrates conscious indifference to the consequences.

## VII.   CLAIMS FOR RELIEF

**Count I**
**Negligence**

206.    Plaintiffs incorporate the allegations contained in all paragraphs of this Complaint as if fully restated herein.

207.    Defendant knew or should have known that the use of the PFAS and/or the discharge of PFAS into the air, soil, groundwater and drinking water was hazardous to human health and the environment.

208.    Defendant knew or should have known that it was unsafe and/or unreasonably dangerous to discharge PFAS into the environment in proximity to surrounding residential communities, including Plaintiffs' and the Decedents' residences.

209.    Defendant knew or should have known that exposure to the PFAS could proximately cause or aggravate the injuries and illnesses from which Plaintiffs suffer and the Decedents suffered.

210.    Defendant should have foreseen that Plaintiffs and Decedents would have been exposed to PFAS as a consequence of Defendant's conduct and that such exposures were capable of causing the diseases from which Plaintiffs suffer and the Decedents suffered.

211.    Defendants should have undertaken the research necessary to ascertain if the PFAS could adversely impact human health, whether their use, manufacture, and/or sale of the PFAS was likely to enter into the environment and whether as a consequence of the use, manufacture and/or sale of the PFAS people, such as the Plaintiffs and the Decedents, would be injured.

212.    Defendants negligently handled the PFAS and failed to prevent the injury of people such as Plaintiffs and the Decedents who were exposed to the PFAS used, manufactured and/or sold by Defendants.

213.    Defendant had a duty to take all necessary steps to prevent Plaintiffs' and the Decedents' exposure to the PFAS.

214.    Defendants had the duty to undertake all studies necessary to prevent the PFAS from causing harm to Plaintiffs and the Decedents and others.

215.    Defendants had a duty to warn Plaintiffs and the Decedents about the possible' exposure to the PFAS and how to avoid that exposure.

216.    Defendants breached the duty owed to Plaintiffs and the Decedents to prevent their exposure to the PFAS.

217.    Defendants breached their duty to undertake all studies necessary to prevent the PFAS from causing harm to Plaintiffs and the Decedents and others.

218.    Defendants breached the duty they owed to Plaintiffs and the Decedents to warn them about their possible exposure to the PFAS and how to avoid that exposure.

219.    Defendant's conduct, with regard to the handling, release and discharge of the PFAS was unreasonable.

220.    Defendant's conduct, which permitted Plaintiffs' and Decedents' exposure to the PFAS, was unreasonable.

221.    Defendant's failure to undertake all studies necessary to prevent the PFAS from causing harm to Plaintiffs and the Decedents and others was unreasonable.

222.    Defendant's failure to warn Plaintiffs and the Decedents about their possible exposure to the PFAS and how to avoid that exposure was unreasonable.

48

223.    Defendants are liable for all illnesses and injuries and derivative damages sustained by Plaintiffs and the Decedents arising out of exposure to PFAS.

224.    The acts and omissions of Defendants, including but not limited to those set forth above, were negligent.

225.    Defendant's acts and omissions, including but not limited to those set forth above, proximately caused injury to Plaintiffs and injury and death to the Decedents.

226.    Plaintiffs and the Decedents have suffered and/or will in the future suffer damage, including but not limited to damage in the form of bodily injury, mental anguish, economic loss, medical expenses, loss of enjoyment of life's pleasures, and disability, and in the case of the Decedents, death, and they were otherwise damaged.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for compensatory and non-compensatory damages and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

## Count II
## Gross Negligence and Recklessness Misconduct

227.    Plaintiffs incorporate the allegations contained in all paragraphs of this Complaint as if fully restated herein.

228.    At all relevant times, Defendant committed acts and omissions with respect to PFAS with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions and/or with gross negligence

229.    Such conduct was motivated by greed in an effort to maximize profit and in disregard of their duties and responsibilities to the public and to Plaintiffs and the Decedents.

230.    The acts and omissions of Defendants, including but not limited to those set forth above, were grossly negligent.

231.    Defendant's acts and omissions, including but not limited to those set forth above, proximately caused injury to Plaintiffs and the Decedents.

232.    Defendants are liable for all illnesses and injuries sustained by Plaintiffs and the Decedents arising out of exposure to PFAS.

233.    Plaintiffs and the Decedents have suffered and/or will in the future suffer damage, including but not limited to damage in the form of bodily injury, emotional distress, economic loss, medical expenses, death of the decedents, and were otherwise damaged.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for compensatory and non-compensatory damages and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

### Count III
### Absolute Liability (Abnormally Dangerous Activities)

234.    Plaintiffs incorporate the allegations contained in all paragraphs of this Complaint as if fully restated herein.

235.    At all relevant times, Defendant 3m manufactured, designed, sold, and supplied hazardous PFAS including NaPFO that were foreseeably disposed of, discharged, and/or emitted into the environment from the West Deptford facility.

236.    As a result of 3M's manufacturing, designing, selling, and supplying PFAS including NaPFO for use at West Deptford Facility; and the foreseeable discharge of the PFAS from the West Deptford Facility into the air, soil, and the groundwater under Plaintiffs' property, Plaintiffs were exposed to and harmed by PFAS.

237.    The manufacturing, designing, sale, utilization, and supply of PFAS by Defendant to a facility that was discharging them into the air, soil, and groundwater in the surrounding

community constitute abnormally dangerous activities that introduce an unusual danger in the community.

238.    Defendant's activities in selling, manufacturing, utilization, disposal, and discharge of the PFAS presented a high degree of risk and of harm to the person, land, and/or chattels of others.

239.    It was likely that the harm resulting from Defendant's activities would be great.

240.    The exercise of reasonable care does not eliminate the risk of harm posed by Defendant's activities.

241.    The dangerous attributes of and risk posed by all Defendant's activities outweighed their value to the community.

242.    At all relevant times, the risk of the Defendant's abnormally dangerous activities outweighed the value to the community.

243.    Defendant's acts and omissions in designing, selling, manufacturing, supplying, utilizing, disposing, and/or discharging hazardous chemicals proximately caused the contamination to Plaintiffs' and Decedents' properties and injuries to Plaintiffs and Decedents, making the Defendant absolutely liable for the harm caused by such contamination.

244.    Defendant foreseeably contributed to the contamination of the environment with the PFAS, and all subsequently contributed to Plaintiffs' and the Decedents' exposure to these chemicals, thereby causing injury to them.

245.    Defendant is liable for all illnesses and injuries and damages sustained by Plaintiffs and the Decedents arising out of exposure to PFAS.

246.    Defendant's acts and omissions, including but not limited to those set forth above, proximately caused injury to Plaintiffs and the Decedents.

52

247. Plaintiffs and the Decedents have suffered and/or will in the future suffer damage, including but not limited to damage in the form of bodily injury, mental anguish, disability, loss of enjoyment of life's pleasures, economic loss, medical expenses, death of the Decedents and were otherwise damaged.

248. As a direct and proximate result of Defendant's shipments and discharges of the PFAS, Plaintiffs and the Decedents have and will continue to suffer damages.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

## Count IV
### Strict Liability (Failure to Warn)

249. Plaintiffs incorporate the allegations contained in all paragraphs of this Complaint as if fully restated herein.

250. Defendant 3M designed, manufactured, supplied, and sold PFAS including NaPFO that were used at the West Deptford Facility.

251. As a manufacturer and seller of PFAS including NaPFO, Defendant 3M had a duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses.

252. Defendant 3M owed that duty to direct users of its products, to reasonably foreseeable users of its products, and also to any person who might reasonably be expected to come into contact with these products, such as Plaintiffs and the Decedents.

253. Defendant 3M's PFAS products including NaPFO were used in a reasonably foreseeable manner and without substantial change in the condition of such products and were defective and unfit for their reasonable use.

254. Defendant 3M knew or should have known that use of its PFAS including NaPFO used at the West Deptford Facility would result in the spillage, discharge, and/or release of PFAS into the environment and would contaminate the environment including the groundwater, air, soil, and drinking water.

255. Defendant 3M knew or should have known that its PFAS would eventually come into contact with and harm residents in surrounding communities, including Plaintiffs and the Decedents.

256. Defendant 3M's PFAS products including NaPFO were defective in design and unreasonably dangerous because, among other things:

   a. PFAS cause extensive and persistent contamination when used in a reasonably foreseeable and intended manner; and

   b. PFAS contamination in the environment, including the air, soil, and groundwater, which are the sources of drinking water to citizens in the surrounding communities, including Plaintiffs, poses significant threats to their health, safety, and welfare.

257. At all relevant times, Defendant 3M's PFAS including NaPFO which they designed, manufactured, and sold were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

258. The foreseeable risk to public health and welfare, including that of Plaintiffs and Decedents, posed by Defendant 3M's PFAS including NaPFO outweighed the cost to Defendant 3M of reducing or eliminating such risk.

259. Defendant 3M knew or should have known about reasonably safer and feasible alternatives to PFAS.

260.    As a direct and proximate result of Defendant 3M's acts and omissions, Plaintiffs and Decedents have and will continue to suffer damages.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

## Count V
### Private Nuisance

261.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

262.    Defendant's acts and omissions with respect to the release of the PFAS in the environment resulted in the contamination of the air, soil, and water, including but not limited to Plaintiffs' and Decedents' water supply, and have thus unreasonably interfered with Plaintiffs' and Decedents' use and enjoyment of their property, invading the home and body of Plaintiffs and Decedents.

263.    Defendant's acts and omissions with respect to the release of the PFAS has made Plaintiffs' and Decedents' water supply unfit for consumption and other domestic purposes.

264.    Defendant's unreasonable interference with the use and enjoyment of Plaintiffs' and Decedents' property constitutes a continuous invasion of their rights.

265.    Defendant contributed to the contamination of the environment with PFAS and all substantially contributed to a private nuisance on Plaintiffs and Decedents.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for compensatory and non-compensatory damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

## Count VI

54

## Public Nuisance

266.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

267.    Defendant's conduct detailed above unreasonably interfered with a right common to the general public, including the public's right to be free from environmental contamination in the air it breathes and water it drinks, and in which its members bathe, shower, and swim.

268.    Defendant's conduct detailed above unreasonably and significantly interfered with the public health and public safety by contaminating water, soil, and air with toxic and carcinogenic chemicals.

269.    Defendant's conduct was of a continuing nature, and/or produced a long-lasting effect, and Defendant knew and/or had reason to know that it would have a significant effect on the public's rights.

270.    Plaintiffs and Decedents suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public.

271.    Defendant's acts and omissions with respect to the release of the PFAS in the environment including the air, soil, and water resulted in the contamination of Plaintiffs' and Decedents' homes and private water supplies.

272.    Defendant's unreasonable interference with the use and enjoyment of Plaintiffs' and Decedents' property constitutes a continuous invasion of her rights.

273.    Defendant contributed to the contamination of the environment with the PFAS, and subsequently contributed to the public nuisance imposed on Plaintiffs and Decedents.

274.     Defendant's creation of a continuing public and/or private nuisance has damaged Plaintiffs and Decedents in the form of bodily injury, emotional distress, and other damages all of a type not common to the general public, for which Defendant is liable.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

### Count VII
### Past and Continuing Trespass

275.     Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

276.     As related above, Plaintiffs and Decedents were owner(s) and/or possessor(s) of real property and reside or resided on those properties.

277.     Defendant negligently, recklessly, and/or intentionally failed to properly control, apply, use and/or ensure the safe disposal of the PFAS resulting in its discharge into the environment entering, invading, intruding, and injuring the rights of Plaintiffs and Decedents to possess and enjoy their properties.

278.     Plaintiffs and Decedents have not consented and do not consent to the contamination alleged herein, and Defendant knew or reasonably should have known that Plaintiffs and Decedents would not consent to such.

279.     Defendant contributed to the contamination of the environment with the PFAS, and all subsequently contributed to the past and continuing trespass imposed on Plaintiffs and Decedents.

280.     As a direct and proximate result of Defendant's acts and omissions as alleged herein, the soil and drinking water wells on Plaintiff's and Decedents' properties have been

contaminated with the Toxins, causing significant personal injuries and damage, including actual, consequential, and nominal damages as described above.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

## Count VIII
### Strict Liability (Defective Design)

281.    Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

282.    Defendant designed, manufactured, marketed, supplied, and sold the PFAS that were used at the Leonard Lane facility and elsewhere as discussed above.

283.    As a manufacturer, supplier, designer, and seller of the PFAS, Defendant had a duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses.

284.    Defendant owed that duty to direct users of their products, to reasonably foreseeable users of its products, and also to any person who might reasonably be expected to come into contact with these products, such as Plaintiffs and Decedents.

285.    Defendant's PFAS-containing products including NaPFO were used in a reasonably foreseeable manner and without substantial change in the condition of such products and were defective and unfit for their reasonable use.

286.    Defendant knew or should have known that use of their products would result in the spillage, discharge, and/or release the PFAS into the environment and would contaminate the environment including the groundwater, air, soil, and drinking water of surrounding communities, including Plaintiffs' and Decedents'.

287.    Defendant knew or should have known that its PFAS containing products including NaPFO would eventually come into contact with and harm residents in surrounding communities, including Plaintiffs and Decedents.

288.    Defendant's products were defective in design and unreasonably dangerous because, among other things:

a.    the PFAS cause extensive and persistent contamination when used in a reasonably foreseeable and intended manner; and

b.    the PFAS cause contamination in the environment, including the air, soil, and groundwater, which are the sources of drinking water to citizens in the surrounding communities, including Plaintiffs, and pose significant threats to their health, safety, and welfare.

289.    At all relevant times, Defendant's products which they designed, manufactured, supplied, and sold were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

290.    The foreseeable risk to public health and welfare, including that of Plaintiffs and Decedents, posed by Defendant's products outweighed the cost to Defendants of reducing or eliminating such risk.

291.    Defendant knew or should have known about reasonably safer and feasible alternatives to their products that contained the PFAS.

292.    As a direct and proximate result of Defendant's acts and omissions, Plaintiffs and Decedents have and will continue to suffer damages.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees and all such other relief as the Court deems proper.

**Count IX: Wrongful Death (N.J.S.A. 2A:31-1 et seq.)**

58

**Plaintiff JOHN D. HUTCHINSON SR., individually and as Executor of the Estate of Theresa Hutchinson v. The 3M Company**

312.    On or about November 17, 2024, Plaintiff THERESA HUTCHINSON, decedent, died, after contracting pancreatic cancer.

313.    The Decedent THERESA HUTCHINSON, decedent, lived the vast majority of her life in Gloucester City, in Camden County New Jersey.

314.    While residing at homes in Gloucester City THERESA HUTCHINSON decedent, was exposed to toxic PFAS, including through contaminated well water that serviced the homes.

315.    Defendant knew or should have known that the use of PFAS and/or discharge of PFAS into the air, soil, groundwater and drinking or household water are hazardous to human health and the environment.

316.     Defendant knew or should have known that it was unsafe and/or unreasonably dangerous to discharge PFAS into the environment in close proximity to surrounding residential communities, including the Decedent's and her family's residence(s).

317.    Defendant had a duty to design, manufacture, sell, and supply safe products, to issue adequate warnings respecting their products, and a duty to take all reasonable measures to ensure that their PFAS-containing products including NaPFO would be effectively contained and not discharged into the surrounding environment, and had duties to investigate the potential toxicity and health effects of the chemicals they were considering utilizing, generating, and emitting; to keep abreast of information in the industrial, scientific, and medical communities germane to their potential adverse health effects; and to share information they learned with members of the communities surrounding Defendants' customers' facilities.

318.    Defendant had a duty to ensure that its customers including at the West Deptford or Leonard Lane facility were operating and managing their facilities and its related wastes in

59

such a way as to not create a nuisance or dangerous condition that could cause injury or damage to human health and the environment.

319. Defendant further had a duty to ensure that its customers' manufacturing processes that utilized 3M's PFAS chemicals did not unreasonably endanger the drinking water relied upon by residents in the surrounding community, including the Decedent's and her family's residence.

320. Defendants breached the above-stated duties by unreasonably manufacturing, designing, selling, and supplying PFAS including NaPFO in a manner which made it foreseeable that they would enter and contaminate the surrounding environment, including but not limited to the air and groundwater, thus exposing nearby residents, including Plaintiffs and the Decedent, who relied upon the groundwater for their drinking and household water supply, and by failing to adequately warn including failure to warn the surrounding community of the hazards posed by their activities and PFAS including NaPFO.

321. Decedent Theresa Hutchinson is survived by her husband, JOHN D. HUTCHINSON, SR., who is entitled to take decedent's intestate personal property, and who has suffered emotional distress and pecuniary losses, including, but not limited to the loss of decedent's financial support, services, guidance, companionship and other assistance and support.

322. As a direct and proximate result of Defendants' negligence, as aforesaid, Decedent and Plaintiffs accrued substantial hospital and medical expenses.

323. As a direct and proximate result of Defendants' negligence, as aforesaid, funeral services were held in memory of decedent, and decedent was buried. Substantial and reasonable expenses were incurred for decedent's funeral and burial.

WHEREFORE, Plaintiff, JOHN D. HUTCHINSON, SR., Individually and as Executor of THE ESTATE OF THERESA HUTCHINSON, demands judgment against Defendants for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees and all such other relief as the Court deems proper.

### Count X: Survivorship (N.J.S.A. 2A:15-3, et seq.)

### JOHN D. HUTCHINSON, SR., Individually and as Executor of THE ESTATE OF THERESA HUTCHINSON v. The 3M Company

324.    Plaintiff, THE ESTATE OF THERESA HUTCHINSON, by JOHN D. HUTCHINSON, SR., Executor, asserts all causes of action available against Defendant pursuant to the Survivor's Act N.J.S.A. 2A:15-3.

325.    As a direct and proximate result of the aforesaid negligence and tortious conduct of Defendant, decedent THERESA HUTCHINSON was severely and fatally injured, suffered great pain and mental anguish, experienced fear and horror of her impending death, and ultimately died due to her injuries.  Decedent THERESA HUTCHINSON, was prevented from living a full, normal and useful life and was quieted forever from engaging in her usual and foreseeable lifelong pursuits.

326.    Decedent's personal injuries, fear of horror of impending death, and ultimate death, were the direct and proximate results of the aforesaid negligent acts of Defendants, and but for her death, Decedent would have been able to maintain an action for damages resulting from her injuries, and Defendants, would have been liable in damages for the injuries so sustained, had death not ensued.

WHEREFORE, Plaintiff, THE ESTATE OF THERESA HUTCHINSON, decedent, by JOHN D. HUTCHINSON, SR., Executor, demands judgment against Defendants, for

compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

**Count XI: Wrongful Death (N.J.S.A. 2A:31-1, et seq.)**

**Plaintiff ANTOINETTE CANZANESE, Individually and as Executor of the ESTATE OF TERRY DONAHUE v. The 3M Company**

327. On or about December 12, 2025, Plaintiff TERRY DONAHUE, decedent, died, after contracting breast cancer.

328. TERRY DONAHUE, decedent, lived the vast majority of her life in Gloucester and Camden County, with the last thirty years of her life being lived in Woodbury and Westville, both in Gloucester County New Jersey.

329. While residing at homes in Gloucester County TERRY DONAHUE, decedent, was exposed to toxic PFAS, including through contaminated water that serviced the homes.

330. Defendant knew or should have known that the use of PFAS and/or discharge of PFAS into the air, soil, groundwater and drinking or household water are hazardous to human health and the environment.

331. Defendant knew or should have known that it was unsafe and/or unreasonably dangerous to discharge PFAS into the environment in close proximity to surrounding residential communities, including Plaintiff's and the Decedent's residence(s).

332. Defendant had a duty to design, manufacture, sell, and supply safe products, to issue adequate warnings respecting their products, and a duty to take all reasonable measures to ensure that their PFAS-containing products including NaPFO would be effectively contained and not discharged into the surrounding environment, and had duties to investigate the potential toxicity and health effects of the chemicals they were considering utilizing, generating, and emitting; to keep abreast of information in the industrial, scientific, and medical communities

germane to their potential adverse health effects; and to share information they learned with members of the communities surrounding Defendants' customers' facilities.

333.    Defendant had a duty to ensure that its customers including at the West Deptford or Leonard Lane facility were operating and managing their facilities and its related wastes in such a way as to not create a nuisance or dangerous condition that could cause injury or damage to human health and the environment.

334.    Defendant further had a duty to ensure that its customers' manufacturing processes that utilized 3M's PFAS chemicals did not unreasonably endanger the drinking water relied upon by residents in the surrounding community, including the Decedent's and her family's residence.

335.    Defendants breached the above-stated duties by unreasonably manufacturing, designing, selling, and supplying PFAS including NaPFO in a manner which made it foreseeable that they would enter and contaminate the surrounding environment, including but not limited to the air and groundwater, thus exposing nearby residents, including Plaintiffs and the Decedent, who relied upon the groundwater for their drinking and household water supply, and by failing to adequately warn including failure to warn the surrounding community of the hazards posed by their activities and PFAS including NaPFO.

336.    Decedent is survived by her daughter, ANTOINETTE CANZANESE, who is Executrix of THE ESTATE OF TERRY DONAHUE, and who is entitled to take decedent's intestate personal property, and who has suffered emotional distress and pecuniary losses, including, but not limited to the loss of decedent's financial support, services, guidance, companionship and other assistance and support.

337.    As a direct and proximate result of Defendants' negligence, as aforesaid, decedent Terry Donahue accrued substantial hospital and medical expenses.

338.    As a direct and proximate result of Defendants' negligence, as aforesaid, funeral services were held in memory of decedent, and decedent was buried. Substantial and reasonable expenses were incurred for both decedent's funeral and burial.

WHEREFORE, Plaintiff, ANTOINETTE CANZANESE, Individually and as Executrix of THE ESTATE OF TERRY DONOHUE, demands judgment against Defendants for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees and all such other relief as the Court deems proper.

## Count XII: Survivorship (N.J.S.A. 2A:15-3 et seq.)

### Plaintiff ANTOINETTE CANZANESE, Individually and as Executor of the ESTATE OF TERRY DONAHUE v. The 3M Company

339.    Plaintiff, ANTOINETTE CANZANESE, Individually and as Executor of the ESTATE OF TERRY DONAHUE asserts all causes of action available against Defendant pursuant to the Survivor's Act N.J.S.A. 2A:15-3.

340.    As a direct and proximate result of the aforesaid negligence of Defendants, decedent TERRY DONAHUE was severely and fatally injured, suffered great pain and mental anguish, experienced fear and horror of her impending death, and ultimately died due to her injuries.  Decedent TERRY DONOHUE was prevented from living a full, normal and useful life and was quieted forever from engaging in her usual and foreseeable lifelong pursuits.

341.    Decedent's personal injuries, fear of horror of impending death, and ultimate death, were the direct and proximate results of the aforesaid negligent acts of Defendants, and but for her death, decedent would have been able to maintain an action for damages resulting from her

64

injuries, and Defendants, would have been liable in damages for the injuries so sustained, had death not ensued.

WHEREFORE, Plaintiff, ANTOINETTE CANZANESE, Individually and as Executor of THE ESTATE OF TERRY DONOHUE demands judgment against Defendants, for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

**Count XII: Wrongful Death (N.J.S.A. 2A:31-1, et seq.)**

**Plaintiff KELLYANN BLYMER individually and as Administrator Ad Prosequendum of THE ESTATE OF OLIVIA BLYMER v. The 3M Company**

341.    On or about May 13, 2025, Plaintiff OLIVIA BLYMER, decedent, died, after contracting ovarian cancer.

342.    Plaintiff OLIVIA BLYMER, decedent, lived the entirety of her life in Brooklawn, New Jersey in Camden County.

343.    While residing at homes in Brooklawn, Plaintiff OLIVIA BLYMER, decedent, was exposed to toxic PFAS, including through contaminated water that serviced her home.

344.    Defendant knew or should have known that the use of PFAS and/or discharge of PFAS into the air, soil, groundwater and drinking or household water are hazardous to human health and the environment.

345.    Defendants knew or should have known that it was unsafe and/or unreasonably dangerous to discharge PFAS into the environment in close proximity to surrounding residential communities, including Plaintiff's residence(s).

346.    Defendant had a duty to design, manufacture, sell, and supply safe products, to issue adequate warnings respecting their products, and a duty to take all reasonable measures to ensure that their PFAS-containing products including NaPFO would be effectively contained and

65

not discharged into the surrounding environment, and had duties to investigate the potential toxicity and health effects of the chemicals they were considering utilizing, generating, and emitting; to keep abreast of information in the industrial, scientific, and medical communities germane to their potential adverse health effects; and to share information they learned with members of the communities surrounding Defendants' customers' facilities.

347.    Defendant had a duty to ensure that its customers including at the West Deptford or Leonard Lane facility were operating and managing their facilities and its related wastes in such a way as to not create a nuisance or dangerous condition that could cause injury or damage to human health and the environment.

348.    Defendant further had a duty to ensure that its customers' manufacturing processes that utilized 3M's PFAS chemicals did not unreasonably endanger the drinking water relied upon by residents in the surrounding community, including the Decedent's and her family's residence.

349.    Defendants breached the above-stated duties by unreasonably manufacturing, designing, selling, and supplying PFAS including NaPFO in a manner which made it foreseeable that they would enter and contaminate the surrounding environment, including but not limited to the air and groundwater, thus exposing nearby residents, including Plaintiffs and the Decedent, who relied upon the groundwater for their drinking and household water supply, and by failing to adequately warn including failure to warn the surrounding community of the hazards posed by their activities and PFAS including NaPFO.

350.    Decedent is survived by her mother, KELLYANN BLYMER, who is Administrator Ad Prosequendum of THE ESTATE OF OLIVIA BLYMER, and is entitled to take decedent's intestate personal property, and who along with the Decedent's family, has suffered emotional

66

distress and pecuniary losses, including, but not limited to the loss of decedent's financial support, guidance, services, companionship and other assistance and support.

351. As a direct and proximate result of Defendants' negligence, as aforesaid, decedent and Plaintiffs accrued substantial hospital and medical expenses.

352. As a direct and proximate result of Defendants' negligence, as aforesaid, funeral services were held in memory of decedent, and decedent was buried. Substantial and reasonable expenses were incurred for both decedent's funeral and burial.

WHEREFORE, Plaintiff, KELLYANN BLYMER individually and as Administrator Ad Prosequendum of THE ESTATE OF OLIVIA BLYMER demands judgment against Defendants for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees and all such other relief as the Court deems proper.

### Count XIII: Survivorship (N.J.S.A. 2A:15-3, et seq.)

**Plaintiff KELLYANN BLYMER individually and as Administrator Ad Prosequendum of THE ESTATE OF OLIVIA BLYMER v. The 3M Company**

353. Plaintiff, KELLYANN BLYMER individually and as Administrator Ad Prosequendum of THE ESTATE OF OLIVIA BLYMER, asserts all causes of action available against all Defendants named herein pursuant to the Survivor's Act N.J.S.A. 2A:15-3.

354. As a direct and proximate result of the aforesaid negligence of Defendants, decedent OLIVIA BLYMER was severely and fatally injured, suffered great pain and mental anguish, experienced fear and horror of her impending death, and ultimately died due to her injuries. Decedent OLIVIA BLYMER was prevented from living a full, normal and useful life and was quieted forever from engaging in her usual and foreseeable lifelong pursuits.

355.    Decedent's personal injuries, fear of horror of impending death, and ultimate death, were the direct and proximate results of the aforesaid negligent acts of Defendants, and but for her death, decedent would have been able to maintain an action for damages resulting from her injuries, and Defendants, would have been liable in damages for the injuries so sustained, had death not ensued.

WHEREFORE, Plaintiff, KELLYANN BLYMER individually and as Administrator Ad Prosequendum of THE ESTATE OF OLIVIA BLYMER, demands judgment against Defendants, for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

## DESIGNATION OF TRIAL COUNSEL

Steven Phillips, Esq. is hereby designated as trial counsel on behalf of Plaintiff.

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

The undersigned counsel certify that, with the following exceptions, the matter in controversy is not the subject of any other action pending or contemplated:

1.    *John Giordano et al. v. Solvay Specialty Polymers, USA, et al.*, C.A., No. 1:19-cv-21573, which is venued in the Camden Vicinage;

2.    *Kimberly Bond et al. v. Solvay Specialty Polymers USA, LLC, et al.*, C.A., No.1:20-cv-08487, which is venued in the Camden Vicinage;

3.    *Theresa Slusser, et al. v. Solvay Specialty Polymers, et al.*, Docket No. 1:20-cv-11393 (D.N.J.);

4.    *Corby Deese and Tammy O'Leary v. Solvay Specialty Polymers, et al.*, Docket No. 1:21-cv-217 (D.N.J.);

5.    *Carly Corrar and Shirley Bond v. Solvay Specialty Polymers, et al.*, Docket No. 1:21-

cv-452 (D.N.J.);

6.    S*hirley Bond v. Solvay Specialty Polymers, et al.*, Docket No. 1:21-cv-11203 (D.N.J.);

7.    *Nicole Bond v. Solvay Specialty Polymers, et al.*, Docket No. 1:21-cv-20755 (D.N.J.);

8.    *Marcia M. Philipp, Gerald L. Philipp, h/w and Gerald E. Philipp v. Solvay Specialty Polymers, et al.*, Docket No. 1:22-cv-395 (D.N.J.);

9.    *Erin Allbritton v. v. Solvay Specialty Polymers, et al.*, Docket No. 1:22-cv-397 (D.N.J.);

10.    *Stacy Allen v. v. Solvay Specialty Polymers, et al.* Docket No. 1:22-cv-396 (D.N.J.);

11.    *Renee Mesogianes and William Mesogianes v. v. Solvay Specialty Polymers, et al.*, Docket No. 1:22-cv-394 (D.N.J.);

12.    *Lombardo, et al. v. Solvay Specialty Polymers, USA, LLC, et al.*, Docket No. 20-15014 (D.N.J.);

13.    *Lloyd v. Solvay Specialty Polymers, USA, LLC, et al.*, Docket No. 21-9705 (D.N.J.);

14.    *Briggs, et al. v. Solvay Specialty Polymers, USA, LLC, et al.*, Docket No. 21-9699 (D.N.J.);

15.    *Britton, et al. v. Solvay Specialty Polymers, USA, LLC, et al.*, Docket No. 21-9707 (D.N.J.);

16.    *Gouse, et al. v. Solvay Specialty Polymers, USA, LLC, et al.*, Docket No. 21-9711 (D.N.J.);

17.    *Philipp, et al. v. Solvay Specialty Polymers, USA, LLC, et al.*, Docket No. 21-9714 (D.N.J.);

18.    *Callis, et al. v. Solvay Specialty Polymers, USA, LLC, et al.*, Docket No. 21-1521 (D.N.J.);

19.    *Severa, et al. v. Solvay Specialty Polymers, USA, LLC, et al.*, Docket No. 20-6906 (D.N.J.);

20.    *Borough of National Park v. Solvay Specialty Polymers, USA, LLC, et al.*, Docket No. 21-9725 (D.N.J.);

21.    *Walzer et al. v. Solvay Specialty Polymers, USA, LLC, et al.* Docket No. 23-4174 (D.N.J.);

22.    *Counselor v. Solvay Specialty Polymers, USA, LLC, et al.* Docket No. 24-10189 (D.N.J.);

23.    *Dupper et al. v. Solvay Specialty Polymers, USA, LLC, et al.*, Docket No. 24-10533 (D.N.J.);

24.    *Blymer et al v. Solvay Specialty Polymers USA, LLC et al.*, Docket No. 25-13774 (D.N.J.);

25.    *Strohm et al. v. Solvay Specialty Polymers USA, LLC et al.*, BUR-L-000508-26 (N.J. Sup. Ct. – Burlington County);

26.    *Harrel et al. v. Solvay Specialty Polymers USA, LLC et al.*, CAM-L-000245-26 (N.J. Sup. Ct. – Camden County); and

27.    *Rebel et al. v. Solvay Specialty Polymers USA, LLC et al.*, BUR-L-000911-26 (N.J. Sup. Ct. – Burlington County).

28.    *Mitchell et al v. E.I. Du Pont de Nemours & Company et al*, 1:26-cv-00708-ESK-AMD

29.    *Johnson et al v. E.I. DuPont de Nemours & Company et al*, 1:26-cv-02260-ESK-AMD

30.    *Keating et al v. Solvay Specialty Polymers USA, LLC et al.*, CAM-L-001901-26 (N. J. Sup. Ct. – Camden County)

The undersigned counsel further certify that we are aware of no other parties who should be joined in this matter at this time.

Dated:  June 3, 2026             BY: *s/  Steven J. Phillips*

PHILLIPS & PAOLICELLI, LLP
Quakerbridge Executive Center
101 Grovers Mill Road
Lawrenceville, NJ 08648
Phone: (609) 789-5600
747 Third Avenue, 6th Floor
New York, NY 10017
Tel.: (212) 388-5100
Steven J. Phillips, Esq.
Daniel J. Woodard, Esq.
Victoria E. Phillips, Esq.
Russell J. Curley, Esq.
Marc C. Gorrie, Esq.

70

BY: *s/　Kevin Conway*
COONEY & CONWAY LLP
191 N. Wacker Drive, Suite 1500
Chicago, IL 60606
Tel: (312) 236-6166
Kevin Conway, Esq. (*Pro hac vice to be submitted*)
Britney Pennycook, Esq. (*Pro hac vice to be submitted*)
LeRoy Martin, III, Esq. (*Pro hac vice to be submitted*)

BY: s/　Peter A. Kraus
WATERS KRAUS PAUL & SIEGEL

WATERS KRAUS PAUL & SIEGEL LLC
3141 Hood Street, Suite 200
Dallas, TX 75219
Tel: 214-357-6244
Peter A. Kraus, Esq. (*Pro hac vice to be submitted*)
Caitlyn Silhan, Esq. (*Pro hac vice to be submitted*)
Chase Johnson, Esq. (*Pro hac vice to be submitted*)

*Attorneys for Plaintiffs*